IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| TIMOTHY C. OWEN, and GLORIA J. OWEN, on behalf of themselves and all others similarly situated, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 06-4067-CV-C-NKL<br>) |
| GENERAL MOTORS CORPORATION, | )<br>) |
| Defendant. | ) |

ORDER

This putative class action case arises out of a malfunction in the windshield wipers on Plaintiffs Timothy and Gloria Owens' ("the Owens") 1999 Chevrolet Tahoe, manufactured by Defendant General Motors Corp. ("GM"). The Owens disclosed to GM their retention of Dr. Michael Pecht as an expert for this litigation. GM moves to disqualify Dr. Pecht [Doc. # 99] as either a consulting or testifying expert for the Owens on the grounds that he and his organization, the Center for Advanced Cycle Engineering ("CALCE"), were previously retained by GM with respect to the wiper assembly that is the subject of this litigation. For the reasons set forth below, GM's Motion is denied.

I.  **Factual Background**

In mid-1997, the National Highway Traffic Safety Administration ("NHTSA") began investigating complaints of wiper failure in seven 1995 GM vehicles. GM began

1

its own investigation by reviewing warranty data with ITTA, the vendor that manufactured the wiper module.  ITTA advised GM that it had changed its singulation process–the process of separating individual circuit boards from the larger "mother" board–and improved its solder process in 1996.  Although GM reported this information to NHTSA, the investigation continued.  GM asked ITTA to identify all process changes and requested returned parts for ITTA to analyze, but ITTA was unable to reproduce the failure.  GM established a Wiper Task Force in late January 1998 to identify the root cause.  GM in-house counsel, Stephen Selander, participated in certain Wiper Task Force meetings to coordinate GM's response to the ongoing NHTSA investigation and to determine whether GM would need to recall any vehicles.

When GM was still unable to reproduce the wiper failure, it decided to consult an outside expert in soldering to help determine the root cause.  James McLeish, Reliability Engineer for GM's Car Group, recommended Dr. Michael Pecht, a Mechanical Engineering Professor at the University of Maryland, whom GM had retained as an expert on several other projects.  Dr. Pecht was also the founder and director of CALCE, a consulting group of which GM was a sponsor.  McLeish, who managed GM's relationship with CALCE, and Brian Lorence, an Engineering Group Manager at GM, contacted Dr. Pecht in early February 1998 about participating in the Wiper Task Force. GM and Dr. Pecht executed a contract on March 11, 1998, which entailed "[p]lanning for GM case to NHTSA: one year effort."

2

GM paid $104,000 for CALCE's expert consultation on the wiper issue. ITTA, the windshield wiper supplier, also paid CALCE for the services performed by Dr. Pecht and the other CALCE employees in connection with the wiper investigation. At the time of this investigation, both ITTA, the supplier, and GM were attempting to show that neither was at fault for the wiper failure, but potential future conflict was clearly contemplated by the parties. (Ex. 4, Bates No. 43979.)

The GM Sponsorship Agreement with CALCE and the University of Maryland provides that:

> 10.1 Any knowledge, know how, practice, process or other information (hereinafter referred to as "Proprietary Information and/or Confidential Information") which a disclosing party wishes to protect against further disclosure, or against use except as authorized herein, and which is disclosed or submitted in writing or in other tangible form, or if disclosed orally summarized in writing within thirty (30) days of such disclosure, which is designated as Proprietary Information and/or Confidential Information to either party by the other, shall be received and maintained by the receiving party with the same degree of care that the disclosing party treats like information of its own, to the extent permitted by law.
> . . .
> 10.2 Nothing contained herein will in any way restrict or impair either party's right to use, disclose, or otherwise deal with any Proprietary Information and/or Confidential Information which:
> . . .
> 10.2.3 Is made available to others by the disclosing party without restrictions similar to those herein.

*Id.* at Pecht Ex. 1.

It is unrefuted that the windshield wiper investigation was a collaborative effort which included:

- General Motors

3

- ITT Automotive (ITTA)

- ITT Defense Electronics (ITTDE)

- Delco

- AC Engineering

- ERS, Inc.

- Engelmaier Associates

- Hanaway & Associates

- Soldering Technology International

- Qualmark

- Robisan Laboratories

- CALCE (approximately 10 team members)"

Lorence managed GM's consultation with Dr. Pecht on the wiper issue, discussing what information Dr. Pecht would need GM to provide him in their joint effort to determine the root cause of the problem and to plan GM's response to NHTSA. Lorence claims to have told Dr. Pecht that the information GM provided him was to be treated confidentially, that GM must review any presentations and publications, and that GM had the right to redact any confidential information and trade secrets. Dr. Pecht disputes that Lorence ever told him to keep any information or resultant work product confidential. He further states that any such requirement would have been impossible given the size of CALCE's team, and such a requirement would have precluded CALCE's involvement in the project.

4

Dr. Pecht and CALCE consulted with GM on the wiper issue from March through September 1998. GM gave Dr. Pecht and other members of the task force, including ITTA, information regarding both GM's current vehicle production and vehicles produced over several years in an effort to determine the root cause of the wiper problem. For example, GM provided warranty data; gave the results of GM's internal research and testing relating to the wiper issue; sent warranty returned parts for analysis; took a member of Dr. Pecht's team to a wiper module assembly plant to test stresses on individual circuit boards; and shared information about GM's investigation of suppliers and tool makers and GM's observations at ITTA's Juarez plant where the wiper circuit boards were manufactured.

GM personnel brainstormed frequently with Dr. Pecht about tests which should be conducted, other avenues of investigation which should be pursued and possible theories of the root cause. Dr. Pecht maintains that future litigation strategy was never discussed at any meetings he attended and that he was frequently excluded from meetings with some GM personnel. He believes his exclusion was to preserve confidentiality and therefore assumed that information discussed at meetings he was allowed to attend was not confidential.

Dr. Pecht and members of his team provided several reports to GM during his consultation, including a final report in late summer 1998, entitled the "GMT Wiper Module SWAT Team Report." This report is stamped "GM CONFIDENTIAL" on every page, though it is unclear whether the stamp watermarked the original report or if it was

5

added later. Dr. Pecht claims that ITTA and other task force members also received this information. It is unclear who else received copies of this report.

During the period of Dr. Pecht's consultation, Lawrence Sessoms, the GM in-house counsel responsible for disputes with vendors, set up an alternative dispute resolution meeting in September 1998 at which GM and ITTA each presented its case regarding the source of the wiper problem. Dr. Pecht acted as GM's expert witness at this meeting. It is unclear to the Court what happened as a result of this meeting.

Following his consultation with GM, Dr. Pecht published an article entitled "Solder Failure Mechanisms in Single-Sided Insertion-Mount Printed Wiring Boards" in Circuit World magazine which he coauthored with GM employees Lorence and Richard Dusek as well as CALCE employees Craig Hillman, Keith Rogers, and Abhijit Dasgupta. The article was based almost entirely on the results of the work performed in connection with the Windshield Wiper Investigation, and includes pictures of solder joints on the circuit boards provided to CALCE by GM during the investigation. GM notes that no confidential information was disclosed in the article and that the pictures used were not identified in such a way as to reveal their source.

Dr. Pecht did no further consulting work for GM after 1999. In 2003, NHTSA asked him to provide information in connection with his work on the windshield wiper investigation. Dr. Pecht offers a letter purportedly sent to GM in February 2003 to confirm his understanding that he did not sign any confidentiality agreements with GM and that he may speak freely about his role in the investigation. The letter states that if he

does not hear otherwise from GM by March 13, 2003, he will "assume that GM is in accord with my recollection . . . and that none of the work I performed for the Company is confidential in any way." The letter produced is not on CALCE or any other letterhead and is not addressed to a particular person at GM but rather to "Dear Sir/Madam." The version of the letter produced to the Court has no return contact information for Dr. Pecht. GM has no record of receiving this letter.

After the present lawsuit was filed, GM counsel repeatedly attempted to contact Dr. Pecht about his possible retention as an expert on class certification issues but received no response. On December 15, 2006, the Owens named Dr. Pecht as an expert witness.

## II.     Discussion

"Federal district courts have the inherent power to disqualify experts." *Koch Refining Co. v. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir. 1996); *United States v. NHC Health Care Corp.*, 150 F. Supp.2d 1013, 1013 (W.D. Mo. 2001). "This power derives from the court's duty to ensure confidence in the fairness and integrity of the judicial process." *NHC Health Care Corp.*, 150 F. Supp.2d at 1013; *United States ex rel. v. Healthcare Rehab Systems, Inc.*, 994 F. Supp. 244, 248 (D. N.J. 1997). When an expert is initially retained by one party to a suit and then simply switches sides during the litigation, the conflict of interest is so obvious that disqualification is always required. *See Koch*, 85 F.3d at 1181. However, when the potential conflict is more tenuous, most courts have rejected a bright-line rule. *Id.; see also Bristol-Myers Squibb Co. v.*

*Rhone-Poulenc Rorer, Inc.*, 2000 U.S. Dist. LEXIS 321, at *11 (S.D.N.Y. 2000); *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588, 590-92 (D. Minn. 1986).

Where there is no bright line rule, the Court must determine (1) whether it was objectively reasonable for the first party who claims to have retained the expert to conclude that a confidential relationship existed, and (2) whether any confidential or privileged information was disclosed by the first party to the expert. *Koch*, 85 F.3d at 1181. Both questions must be answered in the affirmative for the Court to disqualify the witness, and the party seeking disqualification bears the burden on both elements. *Id.* "[D]isqualification is a drastic measure which courts should hesitate to impose except when absolutely necessary." *United States v. Salamanca*, 244 F. Supp.2d 1023, 1025 (D. S.D. 2003). The public's interest is also relevant to the issue of disqualification. *Larson v. Rourick*, 284 F. Supp.2d 1155, 1157 (N.D. Iowa 2003).

GM has not identified any specific information which it claims is confidential; i.e., shared with Dr. Pecht and not with persons outside GM. Nor has GM refuted Dr. Pecht's assertion that other members of the Wiper Task Force, including ITTA, received GM's information during the investigation of the wiper assembly. It has also not refuted Dr. Pecht's assertion that he and CALCE were paid in part by ITTA to conduct the investigation. Given these facts and the specific language in GM's sponsorship agreement concerning confidential information, it is not credible that GM expected the information disclosed to Dr. Pecht to remain confidential. Had GM intended its information to be confidential, it would have marked any documents as required by the

8

contract it signed with Dr. Pecht and the University of Maryland.  Had GM expected its information to be confidential, it would have required all members of the task force to execute a confidentiality agreement, but GM has not shown any such agreement was required.

In terms of public policy, there are factors that weigh in favor of GM's request for exclusion.  The National Society of Engineers has a Code of Ethics which prohibits "participat[ing] in or represent[ing] an adversary interest in connection with a specific project or proceeding in which the engineer has gained particular specialized knowledge on behalf of a former client or employer."  National Society of Engineers, Code of Ethics for Engineers, Section III.46.  However, there are countervailing public policy concerns as well.  The purpose of litigation is to reveal the truth, and there are circumstances where public safety transcends the laudable objectives of a professional organization.  In addition, GM has not presented evidence that the Society of Engineers regards Dr. Pecht's conduct as an ethics violation or that any ethical issues raised by his testimony could not be addressed adequately by the National Society of Engineers without interfering with the ability of the Owens to present their case.

Public policy is further served by permitting academics to freely circulate their research to the public; particularly, where an issue of public safety is concerned.  Finally, Dr. Pecht could be called as a fact witness by the Owens even if not called to give opinions, and he will be subject to cross examination.  Therefore, any bias he has for or against GM will be revealed.

9

While some courts have found in similar circumstances that experts should be excluded, *see Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588 (D. Minn. 1986), and *United States v. NHC Health Care Corp.*, 150 F. Supp.2d 1013 (W.D. Mo. 2001), those courts did not adequately consider countervailing public policy concerns or hold the defendants to their burden of proof. Nor did those cases involve a contract between the parties that required the parties to mark any information they regarded as confidential. Nor did they involve collaborative efforts by multiple parties who were given access to the information that is now claimed to be confidential. Therefore, the Court does not find those cases persuasive.

### III. Conclusion

Accordingly, it is hereby

ORDERED that GM's Motion to Disqualify Dr. Michael Pecht [Doc. # 99] is DENIED.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: April 12, 2007  
Jefferson City, Missouri